The first case on the docket is, looks like Brockus v. Brockus, and it's 513 and 540. Counselor, are you ready to proceed? Yes, Judge. Go ahead. Justice Welch, Mr. Rapelli, and the police and court, I represent John Brockus. The first issue we have is a violation of Madison County's local Rule 8 that says cases are to be held under advisement for more than 90 days. This one sat for a year, and as would be expected from common sense, after a year, there were a lot of errors in the judgments, things omitted, mistakes made. They probably had confidence. Yeah, yeah, yeah, unfortunately a lot. One of the obvious things was we had some Krugerrands, and there were 50 Krugerrands, and of course these are priced by spot gold day by day. There was testimony at trial that as of the day of trial, when the Krugerrands should have been valued, they would have been valued at $37,000, $37,000. What the judge did is value them as of 2009 at about $12,000 less. And first of all, that's a violation of Madison that says you value property at the time of the trial. But more importantly, the judge didn't remember it. And at the hearing on the post-trial motion, I pointed out to her that there was direct testimony on the day of trial as to the values of the Krugerrands. She didn't remember. There were math errors in the judgment. She had a finding in the judgment that John was going to receive rent from a piece of property that they had owned with his brother in the state of Washington. The undisputed testimony is they had not received a rent check in 25 years. Again, lack of recollection of the evidence. And finally, there was the issue of stocks that had been inherited from John's parents. There was no contradictory testimony that these were other than from a non-marital source, and yet she went ahead and found some of them to be a marital asset. And again, I think it's from a lack of recollection of the testimony. There was a record in this case, correct? Yes, sir. On the more substantive end of it, I think the biggest mistake that was made was the lack of recognition of the contribution that John made to the acquisition of the marital estate. The judge is required under Section 503 to look at certain factors in dividing up the marital estate. The first factor is the contribution of each party to the acquisition and enhancement of the marital estate. The judge went through some of the other factors. In this case, four and a half years prior to the separation, John plugged into the marital estate approximately $640,000 that he had inherited from his mother's estate. This was in land and cash and other. They made a deal to buy out the siblings. But there's no question, again, it was not disputed that there was a very substantial infusion on the eve of, not the eve, but four years prior to the divorce. This was a long-term marriage, 30-plus years, but this was the most significant contribution. It wasn't even mentioned in the judgment. Throughout the marriage, John had been the primary wage earner. He was the one that built up the retirement assets and so forth. There was no consideration whatsoever given to the contribution. The award itself was, in my characterization, grossly disproportionate. In my judgment, at best, this should have been an equal division. John made more money, clearly. But if you look at the other factors, in this case, Mr. Raffelli's client, Martha, if you deduct the non-awards, for example, let me tell you what I mean by that. In 2009, 25 of the Krugerrands were sold for $29,000. By the time we got to trial, those were gone. But in the award, John was awarded those Krugerrands that had been sold years earlier and used to pay the house mortgage, the real estate taxes, the bills, and so forth. And, again, it was not disputed that those were not there. So if you take out the non-awards and really look at it, it's approximately 60-plus percent to Martha and less than 40 percent to John. Martha gets a house in 48 years, $300,000, free and clear. She gets 55 percent of most of John's retirement accounts. She gets some of them 100 percent. She gets 100 percent of her retirement accounts. She gets all of the remaining Krugerrands. There were 25 left at the time of trial. She gets all of the savings bonds. And on top of that, John is ordered to pay $36,000 worth of credit card debts against her less than $3,000. There is a disproportionate income. John makes $100,000. Martha makes $38,000. But when you look at that overall, even not factoring in John's disproportionate contribution, this is not a 60-40 case. On top of that, John is ordered to pay non-modifiable maintenance of $54,000. So it's piling on. I mean, it should be a more equal division. It ignores John's disproportionate contribution. It skews it 60-40 to Martha. And then on top of that, in addition to the disproportionate division, John is burdened with the maintenance. And it got worse than that. At the post-trial motion, when we're arguing about the maintenance, the judge then makes the further ruling that the maintenance is not deductible to John and not taxable to Martha, which, as we all know in maintenance, if you do have a high-wager or a low-wager, you use the maintenance to even that out a little bit, make it deductible to one, and it costs less to the lower-income party for receiving it. But what you have here is, on top of everything else, the non-modifiable maintenance and then the non-modifiable maintenance that's not deductible to John. The other issue that I think reflects the lack of recollection of Judge Levy was the non-merit stock issue. There was no question that John had received certain stocks gifted from his parents and from his mother's estate, a whole book of primarily AT&T stocks. And these were during the years when they were doing the divestiture. He had Bell South stock. He had any number of different baby Bell stocks. And as those were spun off, Bell South no longer exists. There were splits, and there were other stocks that were issued. Mr. Raffelli and his client put together an exhibit, their exhibit 7A, that tracked all of this and showed this is when Bell South went out of business and Quest shares were issued or these shares were issued. It tracked all the way through it, and it showed how the stocks that were in existence at the time of the trial were outgrowths from the baby Bells that John had inherited. There was no contradictory evidence that these came from a marital source. There was no evidence on Martha's part that they had purchased stocks during the marriage. And yet, in her order, Judge Levy, after a year, comes up that, well, she thinks some of the stocks were marital. No explanation as to how they were marital or why they were marital, but they were marital. She also ordered John to pay retroactive temporary maintenance. There was an agreed temporary maintenance order during the case, $1,000 a month. John was running the IT area at the St. Louis University Medical Center. He was fired from his job, and it was not disputed that there was a gap of about 12 months when he was not employed. During those 12 months, he's making the payments on the mortgage that covers both of their houses. He's paying the real estate taxes that covers both of their houses. He's paying different utilities that cover both of their houses because they're on this larger plot of land. She then, in the judgment, goes back. During the time that John is earning nothing and Martha's earning $38,000 a year, we filed a motion to abate the child support. Rather than abate it to zero, she awards $500 a month, which is $14,500 at the end. So while John is admittedly unemployed, Martha's making $38,000. He's still ordered to pay $500 a month. Overall, this was not a contentious case. This was a very low-key, even-tempered case. These were not wild and crazy people. I just don't understand how the judge, if she had a clear recollection of the witnesses and how their testimony came out, could find any basis to skew this thing so far to one extreme and to really burden John with what was an unreasonable award on the evidence and constitutes, I think, a clear abuse of her discretion in disregarding the great contribution that he made, not even considering that, and then in ignoring the disproportionate contribution, skewing the overall merit of Division 64. Thank you. Thank you, counsel. Let me ask you on your first argument. Confined with the local rule on timely ruling, a number of circuits have similar local rules. Any authority for that can be a basis to reverse a decision of the trial court. I guess I've always looked at it as basically an in-house type of where the chief judge gets notice of this judge has a timely rule on a case, and if you can't rule within 90 days, you need to make that known to the chief judge and why you can't rule. Any authority for it being other than in-house? Well, and I think that's exactly the intent of the rule. I think what we have in this case, and unfortunately what we've had in a number of other cases coming out of Madison County in the past couple years, is a violation of the rule and damages as a result. You know, if you're two weeks outside of the 90 days and you have a well-reasoned opinion that covers all the issues, I don't think there's any basis to claim error or damages need to reverse on appeal. In this case, what we wanted to show is there were substantive things that the judge absolutely forgot. I mean, we tried the case for two days, and how you could remember that a year later, I think that's why we have the 90-day rule, to give judges a reason to rule promptly when it's fresh in their mind. And I think I don't have a specific authority for you that a violation of a local rule and timeliness of ruling is the basis for an outright reversal. I think the real argument we're making here is because she didn't rule, there were obvious errors in the judgment, some of which she corrected, some of which she didn't, that were a great prejudice to my client. Thank you. Thank you. Thank you. I'm calling for Collinsville. I represent Martha Brockes. We're here to urge the court to affirm the judgment of the trial court. On the Rule 8, I could find nothing that substantiated any finding that because she violated that rule that, therefore, the award that she made was impaired. There is specific things in there that says you have to account to the chief judge every so often and tell him what you're doing, why you haven't ruled on, what's the complexities. Unfortunately, we will never know because this was not raised before Judge Levy in the trial court at the time of the motion. Had he raised it at the time of the motion hearing, we could have had some light shed on the matter. He didn't. One argument that John made was that initially that the court did not have authority to declare the $54,000 maintenance taxable to John and non-taxable to Martha. They cited the federal statute in reply. I cited the second section that expressly gives them authority to do that. And the trial court expressly made it very clear that the maintenance was not deductible by John or taxable to Martha. On this Quest and CenturyLink stock, I was there. I don't know what it is. The burden is upon John. He brought this stock up. We knew nothing about the stock. And they said, well, we got it from AT&T, so we ran the record on AT&T. There was a distribution years ago on some Quest stock, and this was Q-W-E-S-T, not Q-U-E-S-T. And then it went into CenturyLink. Nothing in any of the history of John from the estate or his mother's death or his father's death 20 years earlier was there any mention of this stock. He never received it. He did get substantial AT&T stock, but he did not get the Quest stock. He did not get any CenturyLink stock. And there was never anything provided by him on where that stock came from. I think Judge Levy said, you have the burden of proof, and if it's non-merit, you have to prove it. If you got it in the marriage, I'm going to presume it's merit. I submit there is nothing in the record that he ever indicated that the stock was non-merit. You know, as I recall, Rick Steiger, the attorney, would ask him, lead him right down to the thing and says, Did you have any other stock or did you get this all from your estate? Well, yeah, I got all from the estate and nothing else. The Cougar Rans were largely the same thing. He had 50 Cougar Rans. He took 25 and liquidated them. Judge Levy awarded Martha the other 25 Cougar Rans, which I think she could probably do so. I've never established what he did with them or where he put them. They're sort of asserting that the failure to put an exact monetary amount on the Cougar Rans avoids it. I think that awarding 25 to Martha and 25 to John follows the facts in the record in this case, and I think it's reasonable. John never gave any accounting as to where the Cougar Rans went, exactly what he received from them, or where he put the money or how he spent the money. He again said, Oh, I used it for expenses while he wasn't employed. That goes into the temporary. There was a temporary maintenance issue of $1,000 a month that he was to pay during the proceeding. He was fired and discharged without question from his job in September of 2009. A month later, he filed a motion to terminate, which the judge thereafter heard. He resumed employment at substantially the same wages in December, and he never paid anything further to Martha until the court ruled on that motion to terminate in July. What the judge did is say, the months that you were working, making money, you'll pay that $1,000. We'll start it the month that you began or the month that you filed your motion. And on the 13 remaining months, when you were not drawing any income, we'll allow you $500 when you pay $500 temporary maintenance. He again never gave any itemized statement on how he expended his funds. He didn't pay Martha's insurance. He did apparently pay the taxes on all the properties. All the farmland was on a blanket mortgage. He did pay that. That's $500 a month. He received money from farming the property, never accounted for that. He received a lot of non-merrill monies on the stocks and dividends. He never accounted for that. He never gave anything. He says, this is what I received. I didn't have any money. I had to spend it. I received this much from the group grants. And I used it here, here, and here. He never did give any income. I think Judge Levy was generous in giving $500 during that period. The greatest complaint that John has is that the judge didn't give him adequate consideration for the contribution he made from inherited real estate. Now, the real estate was clearly, if you read the record, Merrill's property. No doubt about it. Counselor, I didn't hear that last part. It was clearly Merrill. It was not, it was in no way, they stipulated it was Merrill, in fact, in the trial. And Martha, they come out with a statement. This is a 30 plus marriage. The marriage was 39 years on the date of the divorce here. It was her anniversary. 30 plus 9. John overlooks that Martha contributed. She worked hand in hand, by the record, on everything to accumulate the various real estate investments. In addition, she single-handedly maintained and took care of the house for John and raised their three children. She worked three jobs and John worked one. John, at the time, was grossing $109,000. Martha was $38,000. Very substantial difference. He clearly has a greater opportunity to accumulate future wealth. Martha received very few liquid assets. Martha has no non-Merrill assets to rely on. John has non-Merrill assets in excess of $135,000. I do not understand how, after a lengthy marriage like this with three sons, and what Martha contributed as a homemaker and a mother, that he can assert that the ruling in the trial court was evidence of inequality or any unusual level of animus towards him. I submit the record is clear, and the judge trial court was correct in their ruling. There was no error. Thank you, counsel. Rebuttal. I just want to respond to a couple of points that Mr. Ruffelli made. On the non-Merrill stock, there was no dispute that the stock that was reflected from John's mother's estate was all non-Merrill. That was not anything that was contested. Their exhibit shows that the Quest stock came from the AT&T spinoffs. I guess the only criticism could be that the attorney handling the estate summarized it as these AT&T shares because these were all on a dividend reinvestment plan, so when something happened to the AT&T shares, it would just show up on the statement as AT&T shares plus Quest plus this. When they put that together, there may be a criticism that they didn't itemize all of it. It was an agreed estate. It was being distributed between John, his brother, and his sister, so there were no contested proceedings. I'm not going to delve into it in detail, but there was no question from the exhibit that John and his client, John Ruffelli and his client prepared that this is where these stocks came from. There was no testimony whatsoever that they could have come from a Merrill source. On the Krugerrands and the temporary maintenance, again, just so we're clear, John Brockes agreed to pay $1,000 a month in temporary maintenance to his wife. They lived on this 80-acre piece of property that had two houses on it. John lived in one. Martha lived in the other. There was one mortgage on it that John always paid. There was one real estate tax bill that John always paid. About three months after he agrees to pay her $1,000 a month, he's fired from St. Louis U., and he has no income. She has $38,000 worth of income. He has no income. He's running up credit cards. He's using the Krugerrands, and there was no disputed trial that during that period of time, Martha was not making the mortgage payment. Martha was not making the real estate tax payments. Martha was not paying the utilities. John was doing all that. And under those circumstances, for the judge to come back in and say, even though you have no income and you're using up other property to pay bills for the benefit of the family, you should still be paying $500 a month. I think it's unreasonable. But as Mr. Raffelli is correct, I think the fundamental issue in this case is the disproportionate division of the Merrill estate. It was a long marriage, but John made the most substantial contributions to the acquisition of the Merrill estate. So in that situation, maybe you balance out his greater contribution against the duration of the marriage, and you say, okay, those two balance out. We'll make this basically a 50-50 even division. The judge didn't do that. She made it 60-40, and then on top of that, she hits him with the $54,000 of totally non-modifiable maintenance that she then makes non-deductible to him. I mean, we see cases that the cases support a greater award of Merrill property in lieu of maintenance. In this case, you ignore the disproportionate contribution. You give her a greater portion of the Merrill estate, and you give the maintenance. On top of that, I think it's an abuse of her discretion. I think it's unreasonable under the evidence. Thank you, counsel. If this would be taken under advisement, you'd be notified of the decision.